Elaine M. SCHMIDT, Administratrix of the Estate of Donald Edward Schmidt, Deceased, and Elaine M. Schmidt, Individually, Plaintiffs-Appellants,

v.

John W. WINGO, Individually, and as Warden of the Kentucky State Penitentiary, Defendant-Appellee.

No. 73-1716.

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1974.

Decided June 21, 1974.

Philip Taliaferro, Covington, Ky., for appellants; Robert E. Sanders, Neace, Taliaferro, Smith & Brown, Covington, Ky., on brief.

M. Curran Clem, Vaughn, Vaughn & Clem, Henderson, Ky., on brief for appellee.

Before PHILLIPS, Chief Judge, and WEICK and PECK, Circuit Judges.

WEICK, Circuit Judge.

The plaintiff, Elaine M. Schmidt, individually and as Administratrix of the Estate of her deceased son, Donald Edward Schmidt, filed suit in the District Court for $200,000, damages for wrongful death, against the Commonwealth of

Kentucky, John W. Wingo, individually and as Warden of Kentucky State Penitentiary at Eddyville, Kentucky, Louie B. Nunn, Governor of the Commonwealth of Kentucky, John C. Taylor, Commissioner of the Department of Corrections, and John Doe, a guard at the Kentucky State Penitentiary at Eddyville.

The complaint alleged that plaintiff's decedent, while an inmate at the penitentiary, received numerous stab wounds inflicted by a fellow-inmate with a knife, as a result of which wounds he died in the prison hospital about seven hours later. The complaint charged that the defendants did not provide adequate medical treatment for the injuries inflicted upon the decedent.

Jurisdiction of the District Court was invoked under the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983, 1988, 28 U.S.C. §§ 1331, 1343, and the Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the Constitution.

On motion to dismiss, all of the state defendants except the Warden in his individual capacity, were dismissed because of sovereign immunity. Joe Doe was dismissed on the ground that suit may not be maintained against a fictitious person. The propriety of this ruling is not before us for review in this appeal.

The plaintiff then filed an amended complaint, adopting the allegations of her original complaint and making as an additional party defendant Doctor Max C. Salb, a general practitioner, who had been employed by the Warden as a prison doctor, on a forty-hour [per week] basis. The amended complaint charged Doctor Salb with medical malpractice.

It was the claim of the plaintiff that the prison hospital did not have adequate facilities for the treatment of the serious stab wounds inflicted upon her son, which injuries included a severing of the intercostal artery and vein, making a rent in the liver and entering the lung in two different places; that a thoracic surgeon was necessary to perform the operation; that the prison doctor was not a surgeon; that the defendants should have immediately removed the decedent to a hospital in another city having adequate facilities and personnel.

Extensive discovery was conducted. A short time before the trial commenced, Doctor Salb died, and the case was revived against his widow, as executrix of his estate. A settlement was effected by Dr. Salb's estate with the plaintiff, and the case proceeded for trial before the Court without a jury, solely against the Warden individually.

The Court adopted findings of fact and conclusions of law in its opinion, and rendered judgment for the defendant. The plaintiff appealed. We affirm.

It appears from the findings of fact that the decedent was mortally wounded by numerous stab wounds in vital organs, the wounds having been inflicted by his fellow-inmate, and that he bled to death as a result thereof. These wounds were described in the Court's findings of facts as follows:

Pursuant to that call, Dr. Salb came to the Penitentiary, arriving there between 3:50 and 4 p.m. When he arrived, he found that Schmidt had numerous stab wounds which were bleeding profusely. The First Aid inmates had given him Dextran interveneously and were applying dressings in an attempt to stem the loss of blood. His clothing was completely removed and he was taken to the large surgery room. Upon removal to surgery, it was found that the blade had entered between the 7th and 8th rib on the right side of the chest, severing the intercostal artery and vein, making a rent in his liver. The second wound penetrated between the 5th and 6th rib in the mammary line puncturing the lung.

A third stab wound entered the back between the 4th and 5th rib, entering the lung, and the upper left arm was penetrated and there was a

laceration in the right shoulder. (App. p. 484).

The evidence to support these findings is contained in the deposition of Dr. Salb which was taken before his death, and also in Dr. Salb's "Medical Statement", plaintiff's Exhibit 7, a copy of which appears in the transcript at pages 314 and 315, as part of the prison hospital record; a copy is also appended hereto.

The Medical Statement refers to Dr. Salb's telephone call to the warden, as follows:

I immediately called Mr. Wingo, after discovering the extent of the injuries, telling him this man should be removed to another hospital because we did not have the equipment to handle such a case. Mr. Wingo asked if we could acquire this equipment immediately and I told him I didn't think so. He then asked if the patient could survive a trip from our clinic to an outside hospital and I replied in the negative, as I considered the patient's condition too serious. Mr. Wingo advised me to do what I could for the man. I immediately returned to the surgery, scrubbed, and with the assistance of an inmate nurse, did what I could do surgically to control the massive hemorrhage. (App. p. 314).

The closing paragraph of Dr. Salb's Medical Statement states:

During the operation I noticed that the patient was becoming Emphysematous. His neck was enlarging due to air under the skin, as was his head and scrotum. I knew then that the patient was dying and nothing more could be done. We administered IV's and the patient expired at 10:10 p. m., August 31, 1970. (App. p. 315).

The District Court found:

Dr. Salb's testimony on deposition was to the effect that he told Wingo that Schmidt should be removed to another hospital because Eddyville did not have the necessary equipment, (page 127). Wingo asked if this equipment could be acquired immediately and Dr. Salb opined that he did not think so. The equipment needed was a ronger and a trocar. Dr. Salb then went on to say, in response to a question from Wingo, as to whether the patient could survive a trip from the Penitentiary to an outside hospital, that he could not. He considered the patient's condition too serious to be moved. (App. p. 485).

The Court further stated:

It is this Court's opinion that as to the Warden, plaintiff must show by a preponderance of the proof a deliberate refusal to follow the recommendation of Dr. Salb. Since Dr. Salb did not give a recommendation that plaintiff's decedent be removed to an outside hospital, the Court concludes that the plaintiff has failed to meet her burden of proof and, therefore, her complaint must be dismissed. (App. at 488–489).

In our opinion a deliberate refusal by the Warden to follow the recommendation of the prison doctor is not the only ground for holding him liable under the Civil Rights Act. In the present case, however, it was claimed that the Warden was liable for not following the recommendation of the prison doctor that the decedent be moved to an outside hospital in another city. The District Court found that the prison doctor made no such recommendation, and therefore the plaintiff failed in her burden of proof.

The District Court cited Stiltner v. Rhay, 371 F.2d 420 (9th Cir. 1967), cert. denied, 386 U.S. 997, 87 S.Ct. 1318, 18 L.Ed.2d 346 (1967), and Mayfield v. Craven, 299 F.Supp. 1111 (E.D.Cal., 1969), aff'd per curiam, 433 F.2d 873 (9th Cir. 1970). In these cases judgment was entered dismissing the complaint for failure to state a claim upon which relief could be granted. It was held in both cases that prison authorities have wide discretion in their treatment of prisoners. We agree.

In Stiltner the Court stated that it found no showing of inadequate medical

care and treatment that would justify federal intervention. In footnote 3 the Court said that under exceptional circumstances the failure to provide or permit access to medical care may rise to Fourteenth Amendment proportions. It cited, for example, Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957), and Hughes v. Noble, 295 F.2d 495 (5th Cir. 1961).

In *Coleman,* allegations that police prevented treatment of bullet wounds so severe that they later required amputation of prisoner's leg, were held to be sufficient to prevent summary disposition of a civil rights action. In *Hughes,* where the complaint alleged that a Sheriff, upon arriving at the scene of an automobile accident, arrested and held incommunicado a person who suffered a broken neck, the Court held that it did not appear beyond doubt that plaintiff could prove no set of circumstances in support of his claim. In *Mayfield* the Court stated that the Civil Rights Act was designed to protect constitutionally-guaranteed rights, not to provide a forum for alleged medical malpractice actions.

*Coleman* and *Hughes* involved wilful and outrageous conduct on the part of the law enforcement officials, which is entirely absent in the present case.

In the footnote in *Stiltner* the Court stated that the allegations in the illustrative cases tend to show an acute physical condition, the urgent need of medical care, the failure or refusal to provide it, and tangible residual injury. The Court then stated that plaintiff's allegations show only that "he has not been receiving the kind and quality of medical treatment he believes is indicated;" and stated further:

> Like the Seventh Circuit, "[w]e know of no authority standing for the proposition that such a claim as plaintiff attempts to assert here is cognizable under the Federal Civil Rights Act." (371 F.2d at 421).

In the present case, unlike the cited cases the issues were not summari-

ly disposed of against the plaintiff. There was extensive discovery here, and a full trial on the merits before the District Court. There was no refusal to furnish medical treatment to the decedent; he was furnished treatment in the prison hospital by the prison doctor as soon as the doctor could get there. The doctor was not a thoracic surgeon and could not perform needed surgery on the liver rent or on the lung. The doctor did all he could to stop the bleeding.

The Court pointed out that it would have taken about one hour for a round trip from the prison to the hospital at Princeton, Kentucky, which was fifteen miles away, and it would have taken from one and one-half to two hours for a round trip to another hospital at Madisonville, Kentucky, even under optimum circumstances. There was no proof that there was a thoracic surgeon at Princeton. It would take time to make the necessary arrangements for a thoracic surgeon and an anesthetist at Madisonville. It must be remembered that decedent had been bleeding during more than forty-five minutes, even before Dr. Salb arrived at the prison hospital. Dr. Salb could do nothing to stop the internal bleeding from the liver rent or the lung. Time was consumed also while he stopped the bleeding in the areas that he was able to reach.

All of this confirms Dr. Salb's opinion that, if moved, the decedent would have died on the way to the hospital outside the prison. Any other conclusion would be sheer speculation. Our reading of the record indicates serious doubt even as to any civil liability of Dr. Salb for malpractice, let alone constitutional violation.

Upon oral argument, when counsel for appellant was questioned about the liability of the doctor, he answered that the settlement made with the doctor's estate was a "gift".

In any event, the Warden relied on the advice of the prison doctor not to move the decedent to an outside hospital in another city. Such reliance does not vi-

olate any duty under the Constitution owed by the Warden to the decedent.

In our opinion the Warden is not personally liable for the adequacy or inadequacy of the facilities at the prison hospital which was built only two years previously by the Department of Corrections of the State.

We are of the opinion that the findings of fact of the District Court are supported by substantial evidence and are not clearly erroneous.

The judgment of the District Court is affirmed.

## APPENDIX

## MEDICAL STATEMENT

RE: SCHMIDT, Donald #25491

I arrived at the institution at approximately 3:50 p.m., after being called at my home, advising me that there had been a stabbing incident at the institution at 3:10 p.m. and Donald Schmidt was severely wounded.

Examination of the patient in the first-aid room revealed numerous stab wounds bleeding profusely. Before I arrived the patient had been given Dextran intravenously, and dressings applied to stem the loss of blood. I had his clothing removed and, due to profuse bleeding, he was removed to the large surgery to reveal the extent of damage done by the stabbing. The following wounds were found:

A blade entered between the seventh and eighth ribs on the right side of the chest severing the intercostal artery and vein, making a rent in the liver.

The second wound penetrated between the fifth and sixth ribs in the mammary line, puncturing the lung.

The third stab wound entered the back between the fourth and fifth ribs entering the lung.

The above openings were bleeding profusely upon inspiration and expiration.

The upper left arm was penetrated through the Brachio Radialin and came out through the Flexor Carpi Ulnaris muscle, dividing the Cubital vein, resulting in excessive hemorrhage. This was ligated immediately.

There also was a laceration on the upper right Deltoid area.

I immediately called Mr. Wingo, after discovering the extent of the injuries, telling him this man should be removed to another hospital because we did not have the equipment to handle such a case. Mr. Wingo asked if we could acquire this equipment immediately and I told him I didn't think so. He then asked if the patient could survive a trip from our clinic to an outside hospital and I replied in the negative, as I considered the patient's condition too serious. Mr. Wingo advised me to do what I could for the man. I immediately returned to the surgery, scrubbed, and with the assistance of an inmate nurse, did what I could do surgically to control the massive hemorrhage.

I injected Lidocaine into the larger wounds, trying to find if they were surgically reparable. I ligated the bleeding points with plain #2 catgut and found that the injury was in the lung itself. This indicated that a Thoracotomy was required to make the lung repair, and this can be done only under a general anesthesia, and we are not equipped for this. We tied off all bleeders with #0 catgut and closed the wounds with 3 & 4 silk sutures.

During the operation I noticed that the patient was becoming Emphysematous. His neck was enlarging due to air under the skin, as was his head and scrotum. I knew then that the patient was dying and nothing more could be done. We administered IV's and the patient expired at 10:10 p.m., August 31, 1970.

/s/ M. C. SALB, M.D.

M. C. Salb, M.D.
Medical Director

PHILLIPS, Chief Judge (concurring).

I concur in the result reached in the majority opinion in this civil rights action for damages brought by the mother

of a deceased prisoner against the warden of a state prison.

Cases holding that prison officials have wide discretion in their medical treatment of prisoners are legion. See, e.g., Stiltner v. Rhay, 371 F.2d 420, 421 (9th Cir.), cert. denied, 386 U.S. 997, 87 S.Ct. 1318, 18 L.Ed.2d 346 (1967); Snow v. Gladden, 338 F.2d 999, 1000 (9th Cir. 1964). Similarly, there are many cases expressing the reluctance of federal courts to become involved in the internal administration of state prisons. See, e.g., Jones v. Metzger, 456 F.2d 854, 855 (6th Cir. 1972); Coppinger v. Townsend, 398 F.2d 392, 393 (10th Cir. 1968).

Our circuit has continued to recognize these general legal principles, but simultaneously we have acknowledged that a prisoner retains all the rights of an ordinary citizen except those expressly or by necessary implication taken from him by law. Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944). Further, prisoners alleging denial of civil rights are entitled to the same consideration by our court as that afforded other civil rights litigants. *Jones, supra*, 456 F.2d at 856. In Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir. 1972), we held that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness (of a prisoner), the denial of such aid constitutes the deprivation of constitutional due process."

In *Fitzke, Id.*, this court, speaking through Judge Miller, declared:

"An individual incarcerated, whether for a term of life for the commission of some heinous crime, or merely for the night to 'dry out' in the local drunk tank, becomes both vulnerable *and* dependent upon the state to provide certain simple and basic human needs. . . . Medical care is . . . such need. Denial of necessary medical attention may well result in disabilities beyond that contemplated by the incarceration itself. The result may be crippling injury, as alleged here, or, as the *Stiltner* court pointed out, the very deprivation of life itself, since, *restrained by the authority of the state*, the individual cannot himself seek medical aid or provide the other necessities for sustaining life and health.

"Thus it is that fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury. This is not to say that every request for medical attention must be heeded nor that courts are to engage in a process of second-guessing in every case the adequacy of medical care that the state provides."

Our present decision, in my view, turns upon the particular facts of this case, and not upon the holding of the District Court that the plaintiff had the burden to show by a preponderance of the evidence a "deliberate refusal" on the part of the warden to follow the recommendation of the prison doctor. I agree with the majority that a "deliberate refusal by the Warden to follow the recommendation of the prison doctor is not the only ground for holding him liable under the Civil Rights Act."

A "deliberate refusal" standard would be too restrictive. Such a standard wrongly assumes the presence of a competent doctor on whose advice the prison warden can rely. Circumstances can be envisioned where a warden might be required to act in the absence of medical advice, such as for injuries or illnesses occurring when a doctor is not available at the prison or of such a serious nature as to require immediate decisions prior to reaching a doctor.

Once informed of the prisoner's injury or illness, it is my view that the warden has the duty under *Fitzke, supra*, to investigate 1) the extent of the injuries, 2) the realistic possibilities of treatment, considering the availability of medical personnel and medical equipment, both inside and outside the prison,

and 3) the consequences of pursuing the alternative methods of medical treatment. If one available avenue of treatment, albeit outside the walls of the prison, could save the life of an injured or ill prisoner, then that is the course which the prison warden would be required to follow.

Nothing in this concurring opinion is meant to imply that the warden of a prison cannot delegate responsibility to his immediate subordinates so that the duties outlined above can be performed by him and his staff at all hours. Nor is it intended to imply that a prisoner injured with a heart wound, for example, would be entitled to the services of the foremost heart surgeon in the nation. A rule of reason, applied on a case by case basis, must determine the adequacy of medical care provided.